IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 03-cv-02319-WDM-MJW

OLOYEA D. WALLIN,

Plaintiff,

v.

CMI,
KIM DEMPEWOLF,
RYAN BRADLEY,
MARYE DEMING,
JASON COLLIDGE, and
MONIQUE M. MARTEL,

Defendants.

---

**RECOMMENDATIONS ON
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Docket No. 238),
DEFENDANT MARTEL'S MOTION TO DISMISS FOR FAILURE TO FILE
CERTIFICATE OF REVIEW (Docket No. 268), and
DEFENDANT MARTEL'S MOTION FOR SUMMARY JUDGMENT (Docket No. 274)**

---

**MICHAEL J. WATANABE
United States Magistrate Judge**


This case is before this court pursuant to an Order of Reference to

Magistrate Judge issued by District Judge Walker D. Miller on October 29, 2004.

(Docket No. 18).

The only defendants remaining in this action are CMI (Corrections Management

Incorporated), Kim Dempewolf (the Director of Centennial Community Transition Center

2

["CCTC"] while plaintiff was a resident), Ryan Bradley (plaintiff's case manager),[1]

Marye Deming (who plaintiff states was the Director of CCTC), Jason Collidge (who

plaintiff states was "Line Staff at CCTC"), and Monique M. Martel (a physician).

Before the court are three dispositive motions.  The first is Defendants' (CMI,

Kim Dempewolf, Marye Deming, and Jason Coolidge) Motion for Summary Judgment

(Docket No. 238).  In an in-court hearing on March 2, 2006, this court directed that

plaintiff's response was due on March 21, 2006 (Docket No. 242), but in a motion filed

on March 22, 2006, plaintiff moved for a fourteen-day extension to file a response,

citing his involvement in discovery in this case and one of his other civil actions, a

March 20 deadline for filing a reply brief in another matter before the Tenth Circuit, and

according to a brief hand-written notation, "[a]s well as inadequate law library access."

(Docket No. 248).  That motion was denied by this court on March 23, 2006 (Docket

No. 251), and plaintiff filed an objection to that ruling (Docket No. 256), which is still

pending before Judge Miller.  The second motion now before this court is Defendant

Martel's Motion to Dismiss for Failure to File Certificate of Review (Docket No. 268).

Plaintiff filed a Response (Docket No. 271) to that motion, and defendant Martel filed a

---

[1]Defendant Bradley has not yet been served.  Plaintiff provided the court with another address for the defendant, and on October 27, 2005, this court issued an Order directing service by the U.S. Marshal.  (Docket No. 161).  A return of service, however, has yet to be filed, and the U.S. Marshal had no record of service when this court inquired during the week of January 22, 2007.  While the plaintiff had also advised the court that Bradley was employed by the Department of Corrections, when the court attempted to obtain a waiver of service of Bradley through the DOC, the documents were returned to the court with a note that service could not be accepted for Bradley because he is not a DOC employee.  (See Docket No. 152).  Therefore, this court found that it would be futile to make another attempt at Service at the DOC.  (Docket No. 161).

Reply (Docket No. 272).  The third motion being considered herein is Defendant

Martel's Motion for Summary Judgment (Docket No. 274).  Plaintiff filed a Response

(Docket No. 288) and an Amended Response (Docket No. 291) to that motion, and

defendant Martel filed a Reply (Docket No. 295).  The court has carefully considered

the motions, the responses thereto, and the replies.  The court now being fully informed

makes the following findings, conclusions of law, and recommendations.

The operative pleading is the plaintiff's Amended Prisoner Complaint filed on

January 5, 2005 (Docket No. 41).  Plaintiff claims therein that while he was housed at

CMI's CCTC,[2] he was forced to take the prescribed medication Antabuse (which

plaintiff calls "Anabuse") for an illness that he did not have and was threatened that if

he did not take that medication, he would be terminated from the CMI-CCTC program.

(Amend. Compl. at 4-5).  He further claims that he complained to defendants

Dempewolf and Ryan that he was suffering "severe headaches, sharp pains in his

chest and adominal [sic] region, dizziness, dihydration [sic], fatiqueness [sic], anxiety

and severe sweating along with diaharrea [sic], from the prescribed Anabuse

medication."  (Am. Compl. at 5).  Nevertheless, defendants allegedly denied his request

to be taken off the medication.  (Am. Compl. At 5).  According to the plaintiff,

"Defendant Ryan stated he could not take me off the medication as everybody in the

program had to take it and the only one who could take a person off would be

Dempewolf."  (Am. Compl. at 5).  In addition, plaintiff alleges that "Defendant Kim

---

[2]Plaintiff entered CCTC on August 22, 2001, as a direct sentence, serving a four-year community corrections sentence for menacing.  See Docket No. 297 at 2, ¶ 3.

4

Dempewolf told the plaintiff that she would not take the plaintiff off the medication after

the plaintiff explained his severe medical problems to her.  Defendant Kim stated that if

Plaintiff was to miss one time of taking the medication, she would terminate him from

the program." (Am. Compl. at 5).  Plaintiff claims Dempewolf and Ryan denied his

request to take a breath analysis in exchange for the medication.  (Am. Compl. at 5).

Finally, he asserts that "Defendant CMI, Mary [sic], . . . and Jason were all informed by

the plaintiff about the alleged violations and failed to act and/or acted in connection

with the alleged constitutional and state violation."  (Am. Compl. at 5).

Pursuant to an Order issued by Judge Miller on June 8, 2005 (Docket No. 74),

plaintiff's first three claims in that pleading were dismissed, and the case remains

pending on only the following four claims:

> Claim Four: . . . 8th Amendment of the United States Constitution violation.
> . . . Defendants have violated the Plaintiffs [sic] rights as to the Cruel and
> Unusual Punishment Clause of the 8th Amendment of the United States
> Constitution by forcing prescribed medication upon the plaintiff.
>
> The defendants forced Plaintiff to take a prescribed medication 'Anabuse'
> [sic] whicvh [sic] is for alcohol related illnesses and was diagnosed as
> having no alcohol related illnesses.  Plaintiff was forced to take
> medication three (3) times per day.  Plaintiff suffered from severe
> headaches, sharp pains in his chest and adominal [sic] region, dizziness,
> dihydration [sic], fatiqueness [sic], anxiety and severe sweating along with
> diaharrea [sic] and mood changes.
>
> Claim Five: State Claim of Negligence
> The defendant [sic] CMI, Dempewolf, Ryan, Mary [sic], . . .[and] Jason . . .
> all acted with negligence in there [sic] job duties causing the plaintiff
> physical and emotional suffering.  Plaintiff made aware these  [sic]
> defendants of the state and constitutional violations and they all failed to
> remedy the situation.
>
> Claim Six: State Claim of Intentional Infliction of Emotional Distress

Supporting Facts:
The defendants CMI, Dempewolf, Ryan, Mary [sic], . . . [and] Jason . . . all
caused the plaintiff intentional physical and emotional pain and suffering
by the acts and denial to act.

Claim Seven: <u>State Claim of Medical Malpractice</u>
Supporting Facts:
The defendant Jane Doe [Monique M. Martel] has committed medical
Malpractice [sic] against the plaintiff by prescribing him a medication
'Anabuse' [sic] for injuries and illnesses that the plaintiff does not possess
causing the plaintiff harm and emotional injuries, and physical injuries.

(Am. Compl. at 7-8).  Plaintiff seeks declaratory and monetary relief, including punitive

damages.

For purposes of a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the

court must accept all factual allegations in the complaint as true and resolve all

reasonable inferences in plaintiff's favor.  <u>Morse v. Regents of the Univ. of Colo.</u>, 154

F.3d 1124, 1126 (10th Cir. 1998); <u>Seamons v. Snow</u>, 84 F.3d 1226, 1231-32 (10th Cir.

1996).  A case should not be dismissed for failure to state a claim unless the court

determines beyond doubt that plaintiff can prove no set of facts which entitles him to

relief.  <u>Hishon v. King & Spalding</u>, 467 U.S. 69, 73 (1984); <u>Conley v. Gibson</u>, 355 U.S.

41, 45-46 (1957).

Furthermore, Rule 56(c) provides that summary judgment shall be granted "if the

pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any, show that there is no genuine issue as to any material fact

and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P.

56(c).  "A party seeking summary judgment bears the initial responsibility of informing

the district court of the basis for its motion, and identifying those portions of the

6

pleadings, depositions, interrogatories, and admissions on file together with affidavits, if

any, which it believes demonstrate the absence of genuine issues for trial." Robertson

v. Board of County Comm'rs of the County of Morgan, 78 F. Supp.2d 1142, 1146 (D.

Colo. 1999) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Mares v.

ConAgra Poultry Co., 971 F.2d 492, 494 (10th Cir. 1992)).  "Once a properly supported

summary judgment motion is made, the opposing party may not rest on the allegations

contained in the complaint, but must respond with specific facts showing the existence

of a genuine factual issue to be tried. . . .  These facts may be shown 'by any of the

kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings by

themselves.'"  Southway v. Central Bank of Nigeria, 149 F. Supp.2d 1268, 1273 (D.

Colo. 2001), aff'd, 328 F.3d 1267 (10th Cir. 2003).  However, "[i]n order to survive

summary judgment, the content of the evidence that the nonmoving party points to must

be *admissible*. . . .  The nonmoving party does not have to produce evidence in a form

that would be admissible at trial, but '"the content or substance of the evidence must be

admissible."' . . .  Hearsay testimony that would be inadmissible at trial cannot be used

to defeat a motion for summary judgment because 'a third party's description of a

witness' supposed testimony is "not suitable grist for the summary judgment mill."'"

Adams v. American Guarantee & Liability Ins. Co., 233 F.3d 1242, 1246 (10th Cir.

2000).  See Wright-Simmons v. City of Oklahoma City, 155 F.3d 1264, 1268 (10th Cir.

1998).

　　　"Summary judgment is also appropriate when the court concludes that no

reasonable juror could find for the non-moving party based on the evidence presented

in the motion and response." Southway, 149 F. Supp.2d at 1273. "The operative

inquiry is whether, based on all documents submitted, reasonable jurors could find by a

preponderance of the evidence that the plaintiff is entitled to a verdict. . . .

Unsupported allegations without 'any significant probative evidence tending to support

the complaint' are insufficient . . . as are conclusory assertions that factual disputes

exist." Id.; Robertson, 78 F. Supp.2d at 1146 (citing Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 250 (1986); quoting White v. York Int'l Corp., 45 F.3d 357, 360 (10th Cir.

1995)). "Evidence presented must be based on more than 'mere speculation,

conjecture, or surmise' to defeat a motion for summary judgment." Southway, 149 F.

Supp.2d at 1274. "Summary judgment should not enter if, viewing the evidence in a

light most favorable to the non-moving party and drawing all reasonable inferences in

that party's favor, a reasonable jury could return a verdict for that party." Id. at 1273.

Since the plaintiff is not an attorney, his pleadings have been construed liberally

and held to a less stringent standard than formal pleadings drafted by lawyers. See

Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991) (citing Haines v. Kerner, 404 U.S.

519, 520-21 (1972)). Therefore, "if the court can reasonably read the pleadings to

state a claim on which the plaintiff could prevail, it should do so despite the plaintiff's

failure to cite proper authority, his confusion of various legal theories, his poor syntax

and sentence construction, or his unfamiliarity with pleading requirements. . . . At the

same time, . . . it is [not] the proper function of the district court to assume the role of

advocate for the pro se litigant." Id.

8

**Exhaustion**

Defendants CMI, Dempewolf, Deming, and Coolege assert in their summary

judgment motion that the Complaint should be dismissed based upon the plaintiff's

failure to comply with the exhaustion requirements of the Prisoner Litigation Reform Act

which states in pertinent part:  "No action shall be brought with respect to prison

conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in

any jail, prison, or other correctional facility[3] until such administrative remedies as are

available are exhausted."  42 U.S.C. § 1997e(a).

Just recently, the United States Supreme Court addressed such requirements in

Jones v. Bock, – S.Ct.–, 2007 WL 135890 (U.S. Jan. 22, 2007).  The Court stated that

"[t]here is no question that exhaustion is mandatory under the PLRA and that

unexhausted claims cannot be brought in court."  Id. at *8.  However, contrary to prior

Tenth Circuit precedent, see Steele v. Federal Bureau of Prisons, 355 F.3d 1204, 1210

(10th Cir. 2003), the Court "conclude[d] that failure to exhaust is an affirmative defense[4]

---

[3]Plaintiff was a resident of CCTF, which is a halfway house.  While this court has not found any Tenth Circuit case law concerning this issue, other courts have held that claims of constitutional violations brought by plaintiffs in a halfway house relate to "conditions of confinement" and thus were claims "with respect to prison conditions" for purposes of § 1997e(a).  Witzke v. Femal, 376 F.3d 744 (7th Cir. 2004); Miller v. The Wayback House, 2006 WL 297769 (N.D. Tex. Feb. 1, 2006).  See also See Jackson v. Johnson, – F.3d –, 2007 WL 10728 (5th Cir. Jan. 3, 2007) (Plaintiff, a halfway house resident, was a "prisoner" within § 1915(h)'s definition because he was confined as a result of his criminal violation.).

[4]In their Answers, defendants CMI, Dempewolf, and Deming raised plaintiff's purported non-exhaustion as a defense.  (Docket No. 85 at 4, ¶ 20; Docket No. 123 at 4, ¶ 21).  Defendant Coolidge did not do so in his pro se Answer (Docket No. 121), nor did defendant Martel do so in her Answer (Docket No. 249).

9

under the PLRA, and that inmates are not required to specifically plead or demonstrate

exhaustion in their complaints." Jones v. Bock, 2007 WL 135890, *11.  Therefore, this

court cannot dismiss the Amended Complaint in this case merely because the plaintiff

failed to demonstrate exhaustion in that pleading.

In the Amended Complaint, in answer to the question "[i]s there a formal

grievance procedure at the institution in which you are confined," plaintiff responded,

"NO." (Am. Compl. at 9).  In addition, in response to the inquiry "[h]ave you exhausted

the avialable [sic] administrative remedies," plaintiff responded, "Yes Through myself

and attorney Bob Hicks through formal contact and court procedures."  (Am. Compl. at

9).  In their summary judgment motion, however, defendants CMI, Dempewolf, Deming,

and Coolidge have shown that there was and currently is a grievance procedure,

namely, a "writ" procedure, at CCTC that the plaintiff failed to utilize with respect to his

claim here, although during his short stay at CCTC, he utilized the procedure for

several other matters.  (See Docket No. 239-3 at 13-16).  Defendant Dempewolf states

in pertinent part in her uncontroverted affidavit:

> 9.  In my capacity as Director of CCTC, I am familiar with the Rules
> and Regulations relating to inmate grievance procedures.  I have
> reviewed **Exhibit B-6**, which is the Rules and Regulations relating to the
> writ procedure in place at CCTC.  The writ procedure is part of the
> Resident Handbook, which is available to all residents at the time they
> enter the program.  **Exhibit B-7** reflects that Mr. Wallin acknowledged
> that he understood all of the Rules and Regulations and received
> clarification concerning any rules and regulations which he did not fully
> understand.
>
> 10.  There are three types of writs an inmate is expected to submit
> when [sic] in order to resolve an issue within the facility: Writ of Grievance
> (Complaint), Writ of Innocence, and Writ of Mitigation (explanation).

10

Residents may request a hearing with respect to any writ, or a response only, and have the right to appeal the response to any writ.  Writs are reviewed on a weekly basis.  One of the main purposes of the writ procedure is to provide a forum in which a resident may bring to the attention of the administration an issue or concern the resident has.  This is done through the Writ of Grievance procedure.  The purpose of the Writ of Innocence and Writ of Mitigation is to allow the resident an opportunity to respond to disciplinary actions.

11.  While he was a resident at CCTC, Mr. Wallin submitted several writs unrelated to the Antabuse treatment he received.  Mr. Wallin submitted several writs on September 4, September 11, October 4, and October 11, 2001.  These are reflected in **Exhbit B-8**.  At no time did Mr. Wallin file any writs with respect to the recommendation for Antabuse treatment in his Program Plan or for the administration of Anatbuse [sic] while he was a resident at CCTC.

(Docket No. 239-4 at 2-3) (emphasis in original).  Defendants have submitted CMI's

Residential Rules and Regulations, which were signed by the plaintiff and which

contain the pertinent provisions concerning the above-mentioned Writ of Grievance

(Docket No. 239-3 at 11 and 12), as well as copies of plaintiff's other Writs that he

submitted on other unrelated matters (Docket No. 239-3 at 13-16).  Defendants have

thus shown the existence of the writ procedure, plaintiff's knowledge and use of the

procedure, and the plaintiff's failure to utilize the procedure for the claim he makes in

this case.  This court thus finds that the plaintiff failed to exhaust the administrative

remedies available to him prior to filing this action.  Therefore, dismissal of plaintiff's §

1983 claim is warranted on this ground.

**Eighth Amendment Claim**

Plaintiff's Eighth Amendment claim, however, should also be dismissed on the

merits.  Defendants CMI, Dempewolf, Deming, and Coolidge assert that the plaintiff has

failed to state an Eighth Amendment claim of deliberate indifference to his medical needs.  This court agrees with that assertion.

The Eighth Amendment's ban on cruel and unusual punishment is violated if defendants' "deliberate indifference to serious medical needs of [plaintiff] constitutes the unnecessary and wanton infliction of pain."  Self v. Crum, 439 F.3d 1227, 1230 (10th Cir.), cert. denied, 127 S.Ct. 131 (2006) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)).  For such deliberate indifference claims, there is "a two-pronged inquiry, comprised of an objective and subjective component.  Under the objective inquiry, the alleged deprivation must be 'sufficiently serious' to constitute a deprivation of constitutional dimension. . . .  In addition, under the subjective inquiry, the prison official must have a 'sufficiently culpable state of mind.'"  Id. at 1230-31.  This court has reviewed the uncontroverted evidence and affidavits submitted by the moving defendants and finds that there is no genuine issue as to any material fact with respect to this Eighth Amendment claim and that the moving defendants are entitled to a judgment as a matter of law.  The undisputed medical evidence supports defendants' assertion that while the plaintiff claims to have suffered from an objectively serious condition, there is no evidence that he suffered from a serious medical condition as a result of taking six doses of Antabuse over a seven-day period.  Furthermore, as shown below, plaintiff had a history of substance abuse, agreed to his Program Plan which included taking the Antabuse, and was medically cleared for taking Antabuse.  There has been no showing that the defendants knew "of and disregard[ed] an excessive risk to [plaintiff's] health or safety" or that they were both "aware of facts from which the

12

inference could be drawn that a substantial risk of serious harm exist[ed], and . . . also [drew] the inference." Id. at 1231.

Plaintiff contends in this action that he was forced or required to take the medication for an illness he did not have.  However, on three occasions, plaintiff signed off on his CCTC Program Plan, which included the Antabuse treatment.  (Docket Nos. 239-4 at 2; 239-3 at 3, 5-6, and 7-8).  Furthermore, while there is no indication in the evidence submitted that plaintiff had an "illness" that required the medication, according to defendant Dempewolf, "Antabuse is a medication that is given to residents as a deterrent to individuals who have a current violent criminal history involving substance abuse and are at an increased level of risk.  Antabuse works by making an individual physically ill only if alcohol is consumed while taking the medication." (Docket No. 239-4 at 2).  Furthermore, a CCTC Initial Treatment Team Presentation form notes that "[c]lient [plaintiff] realizes that his **continued drug/alcohol use** has caused legal problems, but client enjoys the mood altered state."  (Docket Nos. 239-3 at 3; see 239-3 at 5 and 7) (emphasis added).  In addition, one of the "priority goals" in the plaintiff's Program Plan was to "[m]aintain sobriety while in community corrections." (Docket No. 239-3 at 4).  One of the strengths noted regarding that goal was that plaintiff had "stated he has not used alcohol in the past 6 months and cut down on his cocaine."  (Docket No. 239-3 at 4).  There is thus evidence of past substance abuse, including the use of alcohol.

The evidence also shows that the plaintiff was evaluated at Martel Medical (see Docket No. 239-3 at 9) after which he was medically cleared to start Antabuse.  (Docket

13

Nos. 239-4 at 2; 239-3 at 9).  Significantly, the provider (defendant Martel) who filled

out the evaluation did not check off the portion of the form that indicated "Patient is

medically able to start Antabuse at this time but he or she does not see the need

because drinking or using drugs has not been a problem for several months or years.

Or states has never used alcohol or drugs."  (Docket Nos. 239-4 at 2; 239-3 at 9).

While the provider noted that the plaintiff need to be evaluated in one month (Docket

No. 239-3 at 9), plaintiff received just six doses of Antabuse treatment from October 30,

2001, to November 6, 2001 (Docket Nos. 239-4 at 2; 239-3 at 1-2); he did not receive

any Antabuse thereafter; and he was terminated from CCTC on November 8, 2001.

(Docket No. 239-4 at 2).

The moving defendants have also submitted the uncontroverted[5] affidavit of their

endorsed expert, Javier C. Waksman, M.D., who is Board-Certified in Internal Medicine

and Toxicology.  Dr. Waksman was asked "to formulate an opinion on the likelihood

that Mr. Wallin's reported complaints of headache, sharp pain over his chest and

abdomen; dizziness, dehydration, fatigue, anxiety, severe sweating, and mood changes

are associated with the administration of the drug Antabuse (disulfiram), which he

received from October 30, 2001 to November 6, 2001."  (Docket No. 239-6 at 1).  The

doctor noted in his report that "[p]rior to receiving Antabuse, Mr. Wallin underwent a

physical examination which was documented as normal except for obesity and a liver

---

[5]Plaintiff has not endorsed any experts in this case.  The deadlines for endorsing experts have long expired.  (See Docket Nos. 144 - extending plaintiff's deadline to November 4, 2005; 160 - December 5, 2005, deadline for defendants to designate experts; 265 and 266 - June 6, 2006, deadline as to defendant Martel and plaintiff only).

14

function panel, which was unremarkable as well.  He also indicated the presence of

kidney problems, the nature of which is unclear."[6]  (Docket No. 239-6 at 2).  According

to Dr. Waksman:

> . . . Disulfiram inhibits the metabolism of alcohol in the liver
> resulting in the accumulation of acetaldehyde, a metabolite of alcohol
> metabolism.  If alcohol is consumed in the presence of disulfiram, the
> accumulated acetaldehyde induces the so-called disulfiram-ethanol
> reaction or DER.  **The clinical manifestations of DER include
> hypotension, tachycardia (increased heart rate), flushing of the skin
> particularly in the trunk, intense sweating, shortness of breath,
> headache, nausea, and vomiting.  This reaction may last 30 minutes
> to several hours.**  When large amounts of alcohol are consumed, more
> severe symptoms may develop.  Therefore, a dose response relationship
> exists between the severity of symptoms and acetaldehyde concentration
> in the blood.
>
> These uncomfortable symptoms provide the principle for impeding
> consumption of alcohol.  Since poor patient compliance with the disulfiram
> regimens prevents its effectiveness, supervised administration of this
> medication was adopted.  Randomized controlled trials of disulfiram have
> shown that when patients involve a third party to assist their compliance,
> this deterrent approach can improve the outcome of treatment.  This is the
> reason for the supervised administration of disulfiram to Mr. Wallin.

(Docket No. 239-6 at 2-3) (emphasis added).

The doctor further states that the Antabuse prescribed to and taken by plaintiff

was within the recommended dose and that there was no evidence of hepatitis (a rare

adverse effect of Antabuse) or central nervous system adverse effects.  (Docket No.

239-6 at 3).  In addition, he opines:

Mr. Wallin's complaints of headache, fatigue, and dizziness are commonly

---

[6]Despite this court's order of December 6, 2005 (Docket No. 187), directing
plaintiff to sign and execute medical releases for Arapahoe County Detention Facility
and Arkansas Valley Correctional Facility within ten days, plaintiff has continued to
refuse to provide such releases.

15

> reported adverse effects of patients treated with disulfiram; therefore, it is possible that these were associated with commencement of treatment. Since these symptoms subside when the medication is stopped, it is medically unsound that their persistence is related to the short treatment he received.
>
> The complaints of anxiety and mood changes are not associated to disulfiram treatment.  As I previously argued, CNS symptoms were commonly reported with the administration of much higher doses of disulfiram than today's recommended doses which Mr. Wallin received.
>
> Mr. Wallin's symptoms of severe sweating and chest and abdominal pain could possibly be associated to a disulfiram-ethanol reaction.  However, I do not have any evidence to support he resumed consuming alcohol while taking disulfiram.

(Docket No. 239-6 at 5).

In sum, this court finds that the evidence of record fails to raise a genuine issue

of material fact as to whether the defendants acted with deliberate indifference to the

plaintiff's medical condition.

### **Supplemental Claims**

Plaintiff raises state law supplemental claims of negligence, intentional infliction

of emotional distress, and medical malpractice in claims 5, 6, and 7, respectively.

Defendants CMI, Dempewolf, Deming, and Coolidge assert that the court should

decline to exercise supplemental jurisdiction over the plaintiff's state law claims.  This

court agrees.  "Where a district court has dismissed all claims over which it has original

jurisdiction, 28 U.S.C. § 1367(c)(3) expressly authorizes the court to decline to exercise

supplemental jurisdiction over the remaining state-law claims."  Sauer v. McGraw-Hill

Cos., 2001 WL 1250099, *18 (D. Colo. June 12, 2001).  "Whether to exercise

supplemental jurisdiction under such circumstances lies within the discretion of the

16

court." Id. (citation omitted).  Generally, "the balance of factors to be considered will

point towards declining to exercise jurisdiction over state-law claims when the federal

claims have been eliminated prior to trial." Id. (citation omitted).  Furthermore,

"[n]otions of comity and federalism demand that a state court try its own lawsuits,

absent compelling reasons to the contrary." Id. (quotations omitted).  In this case, there

are no compelling reasons to exercise supplemental jurisdiction.  This court thus

recommends that the plaintiff's state law claims be dismissed without prejudice

pursuant to 28 U.S.C. § 1367(c).  See Wallin v. Hill, 2005 WL 1924663 (D. Colo. Aug.

10, 2005) (court declined to exercise supplemental jurisdiction in another action

brought by this plaintiff), aff'd sub nom. Wallin v. Dycus, 2006 WL 2590493 (10ᵗʰ Cir.

Sept. 11, 2006).  Based upon this recommendation, it is further recommended that

defendant Martel's motions be denied without prejudice as the only claim against Martel

appears to be plaintiff's seventh claim, namely, a state law claim of medical

malpractice.

       **WHEREFORE**, for the foregoing reasons, it is hereby

       **RECOMMENDED** that Defendants' [CMI, Kim Dempewolf, Marye Deming, and

Jason Coolidge] Motion for Summary Judgment (Docket No. 238) be granted.  It is

further recommended that judgment be entered for the defendants on the plaintiff's

Eighth Amendment claim (Claim 4), that the court decline to exercise supplemental

jurisdiction over the plaintiff's state law claims (Claims 5 through 7), and that the

plaintiff's state law claims (Claims 5 through 7) thus be dismissed without prejudice.

It is therefore further

17

**RECOMMENDED** that Defendant Martel's Motion to Dismiss for Failure to File Certificate of Review (Docket No. 268) and Defendant Martel's Motion for Summary Judgment (Docket No. 274) be denied without prejudice.  It is further

**RECOMMENDED** that plaintiff's Eighth Amendment claim against unserved defendant Ryan Bradley be dismissed with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and that the state law claims against defendant Ryan Bradley be dismissed without prejudice.

**NOTICE:  Pursuant to 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), the parties have ten (10) days after service of this recommendation to serve and file written, specific objections to the above recommendation with the District Judge assigned to the case.  The District Judge need not consider frivolous, conclusive, or general objections.  A party's failure to file and serve such written, specific objections waives _de novo_ review of the recommendation by the District Judge, Fed. R. Civ. P. 72(b), Thomas v. Arn, 474 U.S. 140, 148-53 (1985), and also waives appellate review of both factual and legal questions.  Makin v. Colorado Dep't of Corrections, 183 F.3d 1205, 1210 (10th Cir. 1999); Talley v. Hesse, 91 F.3d 1411, 1412-13 (10th Cir. 1996).**

Dated: February 1, 2007                    s/ Michael J. Watanabe
     Denver, Colorado                     Michael J. Watanabe
                                     United States Magistrate Judge